## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| WALGREEN CO. and THE KROGER CO., | Case No. 1:25-cv-11680 |
| *Plaintiffs*, | |
| v. | Hon. April M. Perry |
| BIOGEN, INC., | |
| *Defendant*. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT BIOGEN INC.'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

     A.    The Pharmacies' overcharge claims .......................................................3

     B.    The alleged scheme ...................................................................................3

LEGAL STANDARD ..........................................................................................................5

ARGUMENT ........................................................................................................................5

I.    The Pharmacies lack standing or injury to assert claims either in their own names or as the Wholesalers' assignees. ...................................................................5

     A.    *Illinois Brick* bars the Pharmacies' claims. ...........................................5

     B.    The Pharmacies lack standing, as they have not demonstrated that they or the Wholesaler assignors were injured by the alleged conduct .....................6

II.    The Pharmacies fail, as the Plans did, to plausibly plead necessary elements of their antitrust claims—both on their own behalf and on behalf of the Wholesaler assignors .................................................................................................................9

     A.    The formulary-placement allegations do not support a claim that Biogen substantially foreclosed competition. ...................................................10

     B.    Contracting for generic Tecfidera to receive *the same* specialty designations as branded Tecfidera did not substantially foreclose competition. ...............13

     C.    Utilization-management tools did not substantially foreclose competition. ........13

     D.    Patient-assistance coupons are fundamentally pro-competitive. ...............14

     E.    The Pharmacies' "reduction of supply" theory does not hold together. ..........15

CONCLUSION .................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apple Inc. v. Pepper,*
    587 U.S. 273 (2019) ........................................................................................................6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ........................................................................................................6

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................................5, 12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ........................................................................................................7

*Eisai Inc. v. Sanofi-Aventis U.S., LLC,*
    2014 WL 1343254 (D.N.J. Mar. 28, 2014) ..................................................................12

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
    821 F.3d 394 (3d Cir. 2016) ........................................................................................10

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977) ........................................................................................................5

*In re Copaxone Antitrust Litig.,*
    2025 WL 961538 (D.N.J. Feb. 27, 2025) ....................................................................14

*In re Dairy Farmers,*
    2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ................................................................6

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
    680 F. Supp. 3d 919 (N.D. Ill. 2023) ............................................................................9

*In re EpiPen Marketing, Sales Practices and Antitrust Litig.,*
    44 F.4th 959 (10th Cir. 2022) ................................................................................10, 12

*In re Merrill Lynch & Co., Inc. Rsch. Repts. Sec. Litig.,*
    218 F.R.D. 76 (S.D.N.Y. 2003) ..................................................................................15

*In re Surescripts Antitrust Litig.,*
    608 F. Supp. 3d 629 (N.D. Ill. 2022) ............................................................................9

*Kochert v. Greater Lafayette Health Servs., Inc.,*
    463 F.3d 710 (7th Cir. 2006) ..........................................................................................6

*Loc. Beauty Supply, Inc. v. Lamaur Inc.,*
    787 F.2d 1197 (7th Cir. 1986) ........................................................................................6

## TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*Magnus Petroleum Co., Inc. v. Skelly Oil Co.*,
  599 F.2d 196 (7th Cir. 1979) ............................................................................................ 11

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
  29 F.4th 337 (7th Cir. 2022) ........................................................................................... 7, 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ......................................................................................................... 14

*MCI Comm'ns Corp. v. Am. Tel. and Tel. Co.*,
  708 F.2d 1081 (7th Cir. 1983) .......................................................................................... 12

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
  596 F. Supp. 3d 1076 (N.D. Ill. 2022) ............................................................................... 6

*NicSand, Inc. v. 3M Co.*,
  507 F.3d 442 (6th Cir. 2007) .............................................................................................. 7

*Pac. Bell Tel. Co. v. linkLine Comm'ns, Inc.*,
  555 U.S. 438 (2009) .......................................................................................................... 10

*Siva v. Am. Bd. of Radiology*,
  38 F.4th 569 (7th Cir. 2022) ............................................................................................... 5

*Siva v. Am. Bd. of Radiology*,
  418 F. Supp. 3d 264 (N.D. Ill. 2019) .................................................................................. 9

*Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO*,
  433 F.3d 1024 (7th Cir. 2006) ......................................................................................... 7, 8

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ............................................................................................ 10

**FEDERAL STATUTES**

15 U.S.C. § 1 ..................................................................................................................... 3, 9

15 U.S.C. § 2 ..................................................................................................................... 3, 9

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (updated Sept. 2025) ............................................ 12

## INTRODUCTION

Plaintiffs Walgreen Co. and The Kroger Co. (collectively, "the Pharmacies") copy most of their allegations from complaints filed by the third-party payor health plans ("the Plans") in the *In re Tecfidera Antitrust Litigation* action also pending before this Court (No. 1:24-cv-07387). Like the Plans, the Pharmacies allege that Biogen engaged in an anticompetitive scheme to protect two of its drugs, Tecfidera and Vumerity, from generic competition. They take most of their allegations from the Plans' Consolidated Amended Complaint—the complaint that this Court *dismissed* for failure to state a claim. *In re Tecfidera* docket, ECF 27 ("Plans' CAC"). The Pharmacies have solved none of the deficiencies identified in the Court's ruling, instead repeating allegations that the Court has already found wanting. ECF 98 ("Plans MTD Op."). They also take some new allegations from the Plans' latest complaint— but those allegations fail, too, for the reasons that Biogen has explained in its motion to dismiss that complaint. *In re Tecfidera* docket, ECF 112 ("Biogen's Plans MTD"). Biogen incorporates all arguments set forth in that motion, and here sets forth additional reasons that the Pharmacies' claims fail.

**First**, the Pharmacies lack standing or injury to assert their claims. They seek to recover for alleged overcharges for branded purchases, in their own names and as assignees of two wholesalers that allegedly purchased branded Tecfidera and Vumerity from Biogen. The Pharmacies' allegations, however, show that they themselves are indirect purchasers. As such, they lack standing to sue.

Moreover, the Pharmacies also have not alleged that they or their wholesaler assignors were injured by Biogen's alleged conduct. For this reason, too, they lack standing. As the Court noted in its order dismissing the CAC, only entities impacted by the challenged conduct could have a claim. Plans MTD Op. 24–25. For the Pharmacies or their assignors to have been injured by Biogen's alleged scheme, the Pharmacies must have dispensed Tecfidera or Vumerity to patients covered by a restricted PBM formulary, or must have otherwise been impacted by the other alleged conduct that they challenge. There are no such allegations. Without any connection to the supposed scheme, the

Pharmacies are simply offering abstract complaints about the way that some prescription drugs are sold. This defeats not only the Pharmacies' claims in their own names, but also their claims on behalf of their wholesaler assignors—as those claims are predicated on the same allegations of purchases through the Pharmacies, disconnected from any of the challenged conduct.

**Second**, the Pharmacies fail to plausibly plead the essential element of substantial foreclosure. The Pharmacies assert antitrust violations under Sections 1 and 2 of the Sherman Act, based on a theory of exclusive dealing or monopolization earlier asserted by the Plans. This requires the Pharmacies to plausibly allege that Biogen substantially foreclosed generic competition from the market. They have not done so. As in the Plans' CAC, the Pharmacies allege that only some formularies contained the complained-of problems, and that health plans *choose* the pharmacy networks and drug formularies that they use. As the Court has recognized, health plans' freedom to choose their formularies undoes any claim that Biogen substantially foreclosed competition. The Pharmacies similarly repeat the Plans' allegations that Biogen contracted for generic Tecfidera to receive the same specialty treatment as branded Tecfidera and Vumerity, without solving the problem the Court identified: Securing *equal* treatment is not anticompetitive. Finally, although the Pharmacies have lifted some allegations from the Plans' newer (but still deficient) complaint—involving utilization-management tools, patient-assistance coupons, and supposed supply restrictions—those allegations fail to show substantial foreclosure (just as in the Plans' case), and thus do not state a claim.

The Pharmacies' Complaint should be dismissed.

## BACKGROUND[1]

Biogen focuses here on the particulars of the Pharmacies' Complaint, and refers the Court to the briefing and the Court's Opinion in the Plans' case for further background on its products and the pharmaceutical distribution system. Biogen's Plans MTD 3–5; Plans MTD Op. 2–8.

---

[1] Biogen assumes the truth of the Pharmacies' non-conclusory allegations at the 12(b)(6) stage.

### A. The Pharmacies' overcharge claims

The Pharmacies "own[] and operate[] retail stores … at which [they] dispense[] prescription drugs." Compl. ¶¶ 20–21; *id.* ¶ 42. Their role in the healthcare system thus differs from that of the Plans. Like the Plans, however, the Pharmacies' claims center on the notion that "they were overcharged for Tecfidera and Vumerity." *Id.* ¶ 10.

In addition to asserting claims on their own behalf, the Pharmacies say they have been assigned certain claims from "pharmaceutical wholesaler[s]." *Id.* ¶¶ 20–21. Walgreen says AmerisourceBergen Drug Corporation assigned its claims arising out of purchases of "Tecfidera and Vumerity directly from Biogen for resale to Walgreen." *Id.* ¶ 20. Kroger makes the same allegation as to Cardinal Health Inc.'s purchases of "Tecfidera and Vumerity directly from Biogen for resale to Kroger." *Id.* ¶ 21. Both allege that AmerisourceBergen and Cardinal Health (collectively, "the Wholesalers") suffered the same supposed injury as the Pharmacies: They were "overcharged for Tecfidera and Vumerity." *Id.* ¶ 10.

The upshot is that the Pharmacies seek to recover *twice*, at two different levels of the pharmaceutical chain: for each alleged initial overcharge to the Wholesalers, and then also for each alleged overcharge passed on to the Pharmacies. *Id.* ¶¶ 20–21. Moreover, this is in addition to the Plans' attempt to recover for their reimbursements of patients' purchases from pharmacies that were first passed through wholesalers. Plans' Third Am. Compl. ¶¶ 114–16 (*In re Tecfidera* docket, ECF 119) ("Plans' TAC").

### B. The alleged scheme

The Pharmacies assert claims only under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). Compl. ¶¶ 218–33. They predicate those claims on a narrower set of allegations than the Plans' Sherman Act claims. For example, although the Pharmacies refer to a supposed failed product hop from Tecfidera to Vumerity, they expressly do not take a position on whether (and thus do not allege

that) this conduct "was independently unlawful." *Id.* ¶ 13; *see also id.* ¶ 79.[2]

In many respects, though, the Pharmacies' Complaint looks much like the Plans' CAC that this Court dismissed. They allege overcharges stemming from supposedly anticompetitive agreements between Biogen and the PBMs. Like the Plans, the Pharmacies focus their allegations on Biogen's supposed payment of rebates and fees to PBMs in exchange for not "plac[ing] the generics on a better tier than branded Tecfidera and Vumerity." *Id.* ¶ 129; *see also, e.g., id.* ¶¶ 11–12, 127–35. They also follow the Plans' CAC in alleging that Biogen paid PBMs to require generic Tecfidera—like branded Tecfidera and Vumerity—to be dispensed through specialty pharmacies. *Id.* ¶¶ 136–38.

The Pharmacies also copy some allegations from the Plans' latest complaint, alleging that Biogen: negotiated for PBMs to subject generic Tecfidera to the same utilization-management tools as branded Tecfidera (*id.* ¶¶ 127–35); issued coupons to reduce patients' costs for branded Tecfidera and Vumerity (*id.* ¶¶ 159–70); and terminated a contract with one distributor of an authorized generic version of Tecfidera (*id.* ¶¶ 187–95). *See* Plans' TAC ¶¶ 273–78, 287–303, 399–407.

Notably, the Pharmacies claim to have paid overcharges only for *branded* Tecfidera and Vumerity, and not for any purportedly overpriced *generic* Tecfidera. Compl. ¶¶ 225, 232. Unlike the Plans, the Pharmacies allege that generic Tecfidera was "sold at *competitive* prices." *Id.* ¶ 176 (emphasis added). They also emphasize that the "generics were *available* from more than a half dozen manufacturers." *Id.* (emphasis in original). The crux of their claims is that Biogen's alleged conduct caused patients to pay supracompetitive prices for branded Tecfidera and Vumerity, or to receive the more expensive branded products rather than cheaper generic Tecfidera. The Complaint says that "overcharges" resulted. *E.g.*, Compl. ¶¶ 198, 215–16.

---

[2] For good reason: The Pharmacies' Complaint, like the CAC, does not allege that Biogen *coerced* patients to switch from branded Tecfidera to Vumerity. This Court has held, however, that there can be no anticompetitive product hop *without* coercion. Plans MTD Op. 20–22. The Pharmacies also fail to allege substantial foreclosure as a result of any alleged product hop.

**LEGAL STANDARD**

Alleging an "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Plans MTD Op. 8 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Close scrutiny of antitrust claims on a motion to dismiss is "particularly important," given the "enormous expense of [antitrust] discovery." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022).

**ARGUMENT**

**I.     The Pharmacies lack standing or injury to assert claims either in their own names or as the Wholesalers' assignees.**

The Pharmacies seek "overcharge damages" for themselves "and their [wholesaler] assignors." Compl. ¶¶ 226, 233. The Complaint, however, shows that they cannot bring their claims in either capacity. They lack standing to sue in their own names because they are indirect purchasers. *Id.* ¶¶ 214–15. Moreover, they fail to allege any connection to the conduct that they challenge here, and so have no claim either on their own or as the Wholesalers' assignees.

**A.     *Illinois Brick* bars the Pharmacies' claims.**

The Pharmacies appear to assert a claim for damages in their own names. Compl. ¶¶ 226, 233; *see also id.* at p. 58 (Prayer for Relief). The Complaint, however, makes plain that they are indirect purchasers and thus lack standing to seek damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

The Pharmacies do not allege any direct purchases of Tecfidera or Vumerity from Biogen. Moreover, they allege that there are only "*two* sets of direct purchasers": (1) "*wholesalers* that purchased Tecfidera and Vumerity directly from Biogen," and (2) "*[e]mployee health plans and other payors* that purchased Tecfidera and Vumerity at retail directly from specialty pharmacies owned by the three [allegedly] conspiring PBMs." Compl. ¶¶ 214–15 (second and third emphases added). [3] The

---

[3]     The Plans—which Biogen noted are in fact not direct purchasers (Biogen's Plans MTD 9 n.5)—have since acknowledged as much by dropping their claims for damages under the Sherman Act. *In re Tecfidera* docket, ECF 128 ¶ 3.

Pharmacies do not fall into either of those groups. They thus lack standing to seek damages under *Illinois Brick*. As this Court has explained, that decision "instructs that 'a downstream plaintiff cannot sue an alleged monopolist or cartel member on a theory that a middleman passed an anticompetitive overcharge on to her.'" Plans MTD Op. 23 (citation omitted); *see also Apple Inc. v. Pepper*, 587 U.S. 273, 282 (2019) (*Illinois Brick* "allowed direct purchasers to sue but barred indirect purchasers from suing").

The Pharmacies' status as indirect purchasers also precludes their claim for injunctive relief. Biogen's Plans MTD 12–13. "A plaintiff seeking equitable relief under § 16 … should be no less representative of the interests of the antitrust 'victims' than those seeking damages under § 4." *Loc. Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1204 (7th Cir. 1986). The Pharmacies, however, effectively admit that the Wholesalers are "more immediate victims … presumed to be in a better position to advance an action." *In re Dairy Farmers*, 2013 WL 4506000, at *14 (N.D. Ill. Aug. 23, 2013). "The existence of an identifiable class of persons"—the Wholesalers—"diminishes the justification for allowing a more remote party such as the [Pharmacies] to perform the office of a private attorney general." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983).

The Pharmacies' claims on their own behalf therefore cannot proceed.

**B.     The Pharmacies lack standing, as they have not demonstrated that they or the Wholesaler assignors were injured by the alleged conduct.**

In dismissing the Plans' CAC, this Court recognized the common-sense point that a plaintiff challenging Biogen's conduct must allege that it was affected by that conduct: "[O]nly plans using a formulary authored by a co-conspiring PBM and containing the complained-of tiering problems would be injured by the alleged anticompetitive scheme." Plans MTD Op. 24–25; *see also, e.g., Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 715 (7th Cir. 2006) ("What remains in question is whether any of defendants' actions were anticompetitive and, if so, whether the anticompetitive actions led to [plaintiff's] injury."); *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 596 F. Supp. 3d 1076, 1090 (N.D. Ill. 2022) (alleged antitrust injury must, among other requirements, "flow[] from that

which makes the defendants' acts unlawful" (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977))); *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 346 (7th Cir. 2022) (antitrust plaintiffs lacked Article III standing where their allegations failed to "show[] that their injury is fairly traceable to" the challenged conduct).[4]

The same is true here: To recover for any supposed overcharges for branded Tecfidera and Vumerity, the Pharmacies must allege that they were affected by the conduct that they challenge. *See, e.g.*, *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006) (plaintiff's "claimed injuries" must "reflect the anticompetitive effect of … the violation"); *Marion*, 29 F.4th at 346 (plaintiff's injuries must be "fairly traceable" to the challenged, anticompetitive conduct).

The Pharmacies have not alleged the requisite injury. Again, they allege that Biogen: entered formulary agreements that barred PBMs from placing generic Tecfidera on a better tier than branded Tecfidera and Vumerity, and subjected generic Tecfidera to the same specialty designation and utilization-management tools as the branded drugs (Compl. ¶¶ 11–15, 129); issued payment-assistance coupons for privately insured patients' purchases of branded Tecfidera and Vumerity (*id.* ¶¶ 16, 165); and initiated a breach-of-contract suit against a counterparty who manufactured an authorized generic of Tecfidera (*id.* ¶ 187). They thus must connect their claims of harm—both in their own names and as the Wholesalers' assignees—to those forms of conduct.

They have not done so. Even setting aside the Pharmacies' direct-purchaser problem, their claims fail for lack of an injury. Nowhere do the Pharmacies allege that they sold branded Tecfidera or Vumerity to customers covered by a health plan using an allegedly problematic tiering system, specialty designation, or utilization-management program. Nowhere do they allege that they dispensed

---

[4]    To be sure, "antitrust standing and Article III standing are not one and the same." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007). Yet the Pharmacies' failure to allege an injury arising from Biogen's supposed anticompetitive scheme dooms their claims under either doctrine. *See Marion*, 29 F.4th at 346 (affirming grant of motion to dismiss where plaintiffs lacked both Article III standing and an antitrust injury).

Tecfidera or Vumerity to patients using the coupons that they say Biogen issued. Nowhere do they allege that Biogen's claimed dispute with an authorized-generic supplier somehow affected *them* (the Pharmacies) in "dispens[ing] … Tecfidera and Vumerity." *Id.* ¶¶ 20–21; *see also* ¶ 176 ("The generics were *available* from more than a half dozen manufacturers and were sold at competitive prices." (emphasis in original)). Without an injury, there is no basis for any claim.

Nor are these the only ways in which the Pharmacies fail to allege any connection to the challenged conduct: Although they allege a scheme to sell the at-issue drugs through certain specialty pharmacies affiliated with the PBMs (e.g., *id.* ¶¶ 56, 137), they never claim to operate specialty pharmacies. Just the opposite: They specifically distinguish the "retail pharmacy chains" that they operate from "specialty pharmacies." *Id.* ¶ 42, 52; *see also id.* ¶¶ 20–21.

In short, the Pharmacies never allege that the challenged conduct actually injured them. Their claims thus fail. *See, e.g.*, *Tri-Gen*, 433 F.3d at 1031; *Marion*, 29 F.4th at 346. No well-pleaded facts show that the Pharmacies paid overcharges for branded Tecfidera or Vumerity *because of* any conduct by Biogen. Similarly, the Pharmacies cannot claim that Biogen's alleged conduct prevented them from dispensing or substituting generic Tecfidera, which—as the Pharmacies admit—was "available … and sold at *competitive* prices." Compl. ¶ 176 (emphasis added). The Pharmacies are left offering abstract complaints about negotiations between manufacturers and PBMs—without showing that those negotiations had any effect on the Pharmacies.

This failure, moreover, defeats the Pharmacies' claims not only on their own behalf but also as purported assignees of the Wholesalers. The assignments cover *only* the Wholesalers' purchases for resale *to the Pharmacies*. *Id.* ¶¶ 20–21. Thus, absent an allegation that Biogen's conduct affected the Pharmacies' sales, the assigned claims similarly lack any connection to the challenged conduct. The Pharmacies' failure to allege any such connection requires dismissal of the Complaint in its entirety.

II. **The Pharmacies fail, as the Plans did, to plausibly plead necessary elements of their antitrust claims—both on their own behalf and on behalf of the Wholesaler assignors.**

Like the Plans, the Pharmacies rest their claims under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) on an exclusive-dealing theory centered on Biogen's rebate agreements with PBMs. Compl. ¶¶ 127–35. They also allege that the use of specialty designations, utilization-management tools, and patient-assistance coupons—as well as Biogen's dispute with an authorized-generic supplier—excluded generic Tecfidera from the market. *Id.* ¶¶ 136–44, 159–70. The Pharmacies' allegations largely track those in the Plans' now-dismissed CAC, without resolving the dispositive flaws in that complaint that this Court identified. Moreover, to the extent that the Pharmacies have attempted to patch some holes by relying on allegations from the Plans' latest complaint, those efforts fail for the reasons Biogen has laid out in its motion to dismiss that complaint. Biogen's Plans MTD 19–25. Biogen addresses those issues here to further explain why these attempts at overcoming the Court's ruling fail.

To state an exclusive-dealing claim under § 1, a plaintiff must identify conduct that "forecloses competition in a substantial share of the line of commerce at issue, resulting in at least one significant competitor of the defendant who is excluded from doing business in a relevant market." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 979 (N.D. Ill. 2023) (cleaned up). Similarly, to state a monopolization claim under § 2, a plaintiff must plausibly allege exclusionary conduct—that is, competition-destroying conduct that excludes competitors from the market on some basis other than competition on the merits. *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 277 (N.D. Ill. 2019). Here, the Court should again analyze "the Section 1 and Section 2 claims simultaneously," as the Pharmacies' allegations underlying each theory are "entirely coterminous." Plans MTD Op. 10 (quoting *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 651 (N.D. Ill. 2022)). Whatever "particular catchy title" the Pharmacies seek to invoke for their "analytical approach," they must plausibly allege conduct that

9

"forclos[es] … a competitor from a market." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 435, 462 (7th Cir. 2020) (emphasizing that the Sherman Act exists to protect market competition).

Moreover, as it did when dismissing the CAC, the Court must assess each of the Pharmacies' theories of wrongdoing independently. Biogen's Plans MTD 13–14. When alleged anticompetitive conduct "does not fit within a single paradigm, … courts disaggregate the exclusionary conduct into its component parts." *In re EpiPen Marketing, Sales Practices and Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) (discussing *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 449–52, 457 (2009)). Even in the context of some coherent broader scheme (which is absent here), courts first "must evaluate [a defendant's] allegedly exclusionary conduct separately." *Id.* Here, just as in the Plans' CAC, the Pharmacies do not plausibly allege any form of anticompetitive conduct.

### A. The formulary-placement allegations do not support a claim that Biogen substantially foreclosed competition.

The Pharmacies' central theory of market foreclosure—based on the formulary placement of generic Tecfidera—is identical to the theory that this Court rejected when dismissing the Plans' CAC, and so fails for the same reason. Biogen's Plans MTD 20–22. As the Court recognized, the core problem with this theory is that it turns on health plans' choices: "If plans can, and apparently do, choose formularies *lacking* the features complained of in Plaintiffs' allegations, the Court cannot see how generic competition was meaningfully stifled in the market for dimethyl fumarate products to Biogen's advantage." Plans MTD Op. 18 (emphasis added). The Pharmacies have not solved that problem of choice. Indeed, they repeat the very allegation that spurred the Court's conclusion, admitting that "plans may choose which pharmacy networks and drug formularies to use among the PBM's offerings based on health plan designs." Compl. ¶ 65; Plans' CAC ¶ 100 (same).

Given that plans choose which formulary to use, the Pharmacies cannot claim that Biogen foreclosed generic competitors. *See, e.g., Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) ("[I]f customers are free to switch to a different product in the marketplace but choose not

to do so, competition has not been thwarted ….”); *Magnus Petroleum Co., Inc. v. Skelly Oil Co.*, 599 F.2d 196, 201 (7th Cir. 1979) (agreements “did not substantially foreclose competition because in the key years plaintiffs bought large quantities of gasoline from other suppliers”). As with the Plans’ CAC, this is an “obstacle to the plausibility of [the Pharmacies’] foreclosure allegations.” Plans MTD Op. 17. Indeed, this obstacle is particularly difficult to overcome given that the Pharmacies admit that generic Tecfidera was “available from more than a half dozen manufacturers and w[as] sold at competitive prices.” Compl. ¶ 176.

The Pharmacies try getting around this obstacle by making a bare assertion of “information asymmetries.” Compl. ¶ 65. That, however, is the same unexplained allegation that the payors offered in the CAC and that the Court found “implausible, given that the majority of U.S. patients (and their sponsoring plans) seem to have avoided the allegedly problematic formulary schemes altogether.” Plans MTD Op. 17–18. Indeed, the Plans’ operative complaint alleges that *most* patients—60%—were *not* affected by the alleged same-tier problem, reinforcing a lack of market foreclosure. Biogen’s Plans MTD 21; Plans’ TAC ¶¶ 248–49. The Pharmacies (who are represented by the same firm that serves as interim lead counsel for the Plans) seek to avoid that problem by simply omitting any specifics as to how many individuals were affected. Their silence, however, does not solve the plausibility gap that this Court identified. The Pharmacies offer nothing more than the conclusory “information asymmetries” that this Court already rejected, and so the same result should apply.

Even if the Pharmacies could overcome the problem of health plans’ choice, their formulary-tier allegations would fail. Like the Plans, they claim that the tiering agreements had the effect of “disabl[ing] automatic generic substitution for a substantial portion of the relevant sales.” Compl. ¶ 149. That conclusory allegation does not suffice for three reasons.

**First**, the Pharmacies never allege that *they* sold Tecfidera or Vumerity—or even operated pharmacies—in States where generic substitution was supposedly foreclosed. Their theory cannot

proceed without those links. *See* Plans MTD Op. 24 ("[N]owhere do Plaintiffs allege that they … were subject to any formulary tainted by the alleged scheme. This itself is grounds for dismissal.").

**Second**, the Pharmacies fail to allege the percentage of patients covered by Plans with formularies in which generic and branded Tecfidera were on the same tier. Their allegations involving aggregate percentages of "affected" insureds (Compl. ¶¶ 153–55) do not fill that gap, as they do not even try to account for issues the Court has identified, such as the rate of insureds using coinsurance rather than copays. *See* Plans MTD Op. 15 n.2 ("[E]quivalent tiering in a coinsurance plan would still allow drug substitution laws to operate as intended …."). Without offering a percentage that rules out "obvious alternative[s]" that are not anticompetitive—particularly in light of this Court's prior ruling—the Pharmacies do not plausibly allege substantial foreclosure. *Twombly*, 550 U.S. at 567; *see also* Areeda & Hovenkamp, *Antitrust Law* ¶ 310c(2) (updated Sept. 2025) (aggregation is meaningless "when there is no cardinal unit in one [theory] that can be added to any unit in another to produce a meaningful sum").

**Third**, generic-substitution laws do not prohibit branded pharmaceutical manufacturers from competing against generic entrants. Courts have found that competition for formulary access, including through rebate agreements, is lawful price competition—the type of conduct that the antitrust laws were designed to protect, not deter. *See, e.g.*, *EpiPen*, 44 F.4th at 987 ("No one can seriously dispute that exclusive rebate agreements stimulate price competition in the prescription drug market."); *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *26–37 (D.N.J. Mar. 28, 2014) (manufacturer's requirement that PBMs not disadvantage its product was not anticompetitive), *aff'd*, 821 F.3d 394 (3d Cir. 2016). PBMs extract these "price concessions" by demanding "different rebate offers for different levels of formulary placement." *EpiPen*, 44 F.4th at 966–67. Competition cannot lead to *unlawful* foreclosure. *See, e.g.*, *MCI Commc'ns Corp. v. Am. Tel. and Tel. Co.*, 708 F.2d 1081, 1199 (7th Cir. 1983) ("Vigorous competition" is "exactly what the Sherman Act was enacted to encourage.").

The Pharmacies' formulary-tier allegations thus fail, just like the Plans' allegations.

**B.    Contracting for generic Tecfidera to receive *the same* specialty designations as branded Tecfidera did not substantially foreclose competition.**

Like the Plans, the Pharmacies allege that Biogen contracted for generic Tecfidera to be subject to "the same [specialty] dispensing restrictions" as branded Tecfidera, leading to generic Tecfidera being distributed through specialty pharmacies. Compl. ¶ 14; *see also id.* ¶ 137. The Court, however, already questioned how ensuring that "the generic and branded drugs were treated *the same*" could be "anti-competitive." Plans MTD Op. 15 n.3 (emphasis added). The Pharmacies have not solved that problem, either. Just as in the Plans' latest complaint, there are no allegations to explain how Biogen's negotiating for *equal* treatment excluded generic Tecfidera from the market. Biogen's Plans MTD 24.

Indeed, the Pharmacies ultimately confirm the inadequacy of their specialty-designation allegations. Although they assert in conclusory fashion that Biogen "knew and intended" that such designations would result in "astronomically high" prices for generic Tecfidera (Compl. ¶ 137), they allege that what *actually* happened is that the generics "were sold at *competitive prices*" (*id.* ¶ 176 (emphasis added)). So in their own telling, the scheme—including the specialty designations—did *not* inflate generic prices. The Pharmacies are thus unable to connect this theory to any competitive foreclosure.

**C.    Utilization-management tools did not substantially foreclose competition.**

The Pharmacies follow the Plans' lead in making allegations about Biogen's alleged agreements with PBMs to subject generic Tecfidera to utilization-management tools. Compl. ¶¶ 139–44; Plans' TAC ¶¶ 273–86. These allegations run into two insurmountable hurdles.

**First**, the Pharmacies admit that these alleged utilization-management tools were "the same dispensing restrictions that [the PBMs] imposed on [branded] Tecfidera." Compl. ¶ 14. Again, however, the Court has recognized the "difference from an antitrust perspective between a demand to be treated equally to a competitor and a demand that the competitor be disadvantaged." Plans MTD Op. 15 n.3. The Pharmacies fail to allege that requiring the *same* utilization-management tools for

branded and generic Tecfidera somehow interfered with generic substitution. Nor do they explain how *equal* treatment could have substantially foreclosed competition. Biogen's Plans MTD 21 & n.8.

**Second**, the Pharmacies (like the Plans) concede that utilization-management tools are "legitimate" means of promoting "price competition" (*id.* ¶¶ 141, 144). They offer no explanation of why these otherwise legitimate tools were somehow unlawful here. Biogen's Plans MTD 21.

### D. Patient-assistance coupons are fundamentally pro-competitive.

Like the Plans in their operative complaint, the Pharmacies allege that Biogen harmed competition by issuing coupons that covered insured patients' copayments or coinsurance for purchases of branded Tecfidera and Vumerity. Compl. ¶¶ 159–70; Plans' TAC ¶¶ 258–72. In other words, they say it was anticompetitive for Biogen to *reduce* consumers' costs.

As Biogen explains in its motion to dismiss the Plans' operative complaint, patient assistance is fundamentally pro-competitive. Biogen's Plans MTD 24–25; *see also, e.g., In re Copaxone Antitrust Litig.,* 2025 WL 961538, at *25 (D.N.J. Feb. 27, 2025) ("[L]owering a patient's out-of-pocket costs … does not make the conduct anticompetitive."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition."). Indeed, the Pharmacies allege that the coupons caused insureds to "pay *less* for Tecfidera than they would have paid" for the generic—and they recognize that the price of generic Tecfidera was "competitive." Compl. ¶¶ 166, 176. "[A]n allegation of harm to the [Pharmacies]—by being forced to purchase more expensive brand [Tecfidera] instead of more cost effective generic [Tecfidera]—does not allege harm to the market *as a whole.*" *See Copaxone,* 2025 WL 961538, at *25 (cleaned up and emphasis added). They cannot claim that reduced patient costs were somehow *anti*-competitive.

Moreover, the Pharmacies (correctly) do not allege that Biogen began offering these coupons only upon generic Tecfidera's entry. *See Copaxone,* 2025 WL 961538 at *26 ("The allegation that the Copay Assistance 'suppressed generic competition' is further undermined by the fact that the Copay

Assistance is alleged to have occurred for nine years before there was an available generic."). Nothing in the antitrust laws requires branded manufacturers to stop offering patient assistance—and thus increase patients' prices—once a generic enters the market.

### E. The Pharmacies' "reduction of supply" theory does not hold together.

Finally, the Pharmacies, like the Plans, parrot allegations from another lawsuit—namely, that Biogen terminated a contract with a distributor to sell an authorized generic version of Tecfidera. Compl. ¶¶ 187–95; Plans' TAC ¶¶ 399–407. The Pharmacies try framing this as a market-foreclosure issue, but that effort is unavailing. Their borrowed allegations—resting on unproven assertions from another case—are not well-pleaded facts. Biogen's Plans MTD 17; *see In re Merrill Lynch & Co., Inc. Rsch. Repts. Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("[R]eferences to preliminary steps in litigations … that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) …."). Even if those allegations could be credited, moreover, the Pharmacies nowhere allege that a contract dispute over an authorized generic—which is simply a brand-manufacturer drug marketed under a generic label (Compl. ¶ 188)—impacted the price or availability of generic Tecfidera. Just the opposite: They allege that "[t]he generics were *available* from more than a half dozen manufacturers and were sold at competitive prices." *Id.* ¶ 176. Further, nothing in the Complaint suggests that the authorized-generic supplier was foreclosed from selling *generic* Tecfidera, even accepting the Pharmacies' allegations of a dispute over whether it could sell Biogen's *authorized* generic. The Pharmacies' failure to allege any impact on the market defeats their allegation that this dispute with a single company foreclosed market competition.

### CONCLUSION

The Pharmacies' Complaint should be dismissed.

Dated: December 2, 2025

Respectfully submitted,

/s/ *Eddie Hasdoo*
Eddie Hasdoo
**JONES DAY**
110 North Wacker Drive
Chicago, IL 60606
(312) 269-4214
ehasdoo@jonesday.com

Daniel Paul Johnson (*pro hac vice* pending)
**JONES DAY**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 394-7217
dpjohnson@jonesday.com

/s/ *Lin Kahn*
Lin Kahn (*pro hac vice*)
**JONES DAY**
555 California St., 26th Floor
San Francisco, CA 94104
(415) 875-5711
lkahn@jonesday.com

Julie McEvoy (*pro hac vice*)
William D. Coglianese (*pro hac vice*)
**JONES DAY**
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
jmcevoy@jonesday.com
wcoglianese@jonesday.com

*Counsel for Defendant Biogen Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on December 2, 2025, a true and accurate copy of the foregoing was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois by filing through the CM/ECF system, which served a copy of the foregoing upon all counsel of record.

/s/ *Lin Kahn*
Lin Kahn