**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| WALGREEN CO. and THE KROGER CO.,<br><br>Plaintiffs,<br><br>v.<br><br>BIOGEN, INC.,<br><br>Defendant. | Case No. 25-cv-11680<br>Hon. April M. Perry<br>Hon. Young B. Kim |

**PLAINTIFFS' OPPOSITION TO BIOGEN'S MOTION TO DISMISS**

# TABLE OF CONTENTS

ARGUMENT ....................................................................................................................2

I. PLAINTIFFS HAVE STANDING TO RECOVER DAMAGES PURSUANT TO THEIR ASSIGNMENTS AND TO OBTAIN INJUNCTIVE RELIEF IN THEIR OWN RIGHT ....................................................................................2

II. PLAINTIFFS HAVE ALLEGED AN ILLEGAL SCHEME AND CONSPIRACY THAT VIOLATES THE SHERMAN ACT ....................................................................6

A. The Court Should Consider Biogen's Conduct as a Whole....................................7

B. Plaintiffs Adequately Allege That Biogen Interfered With Generic Competition by Bribing PBMs ....................................................................7

C. Plaintiffs Adequately Allege That the Copay Assistance Program Interfered With Automatic Generic Substitution....................................................11

D. Plaintiffs Adequately Allege That Biogen Restricted the Supply of Generic Tecfidera By Terminating a Contract With Teva to Sell an AG ..........................13

CONCLUSION..............................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Apple, Inc. v. Pepper*,
587 U.S. 273 (2019) ....................5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ....................13

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ....................7, 13

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) ....................8

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) ....................12

*Firestone Financial Corp. v. Meyer*,
796 F.3d 822 (7th Cir. 2015) ....................3

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968) ....................4

*Hartig Drug Co. v. Senju Pharm. Co., Ltd.*,
836 F.3d 261 (3d Cir. 2016) ....................5

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ....................1, 8

*In re Broiler Chicken Antitrust Litigation*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ....................5

*In re Copaxone Antitrust Litigation*,
2025 WL 961538 (D.N.J. Feb. 27, 2025) ....................11

*In re EpiPen Marketing, Sales Practices & Antitrust Litigation*,
44 F.4th 959 (10th Cir. 2022) ....................7

*In re Fine Paper Antitrust Litigation*,
632 F.2d 1081 (3d Cir. 1980) ....................1

*In re Gabapentin Patent Litigation*,
649 F. Supp. 2d 340 (D.N.J. 2009) ....................10, 13

*In re Loestrin 24 FE Antitrust Litigation*,
433 F. Supp. 3d 274 (D.R.I. 2019) .................................................................... 9, 12-13

*In re Opana ER Antitrust Litigation*,
2016 WL 738596 (N.D. Ill. Feb. 25, 2016) ................................................................1, 2, 5, 9

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015) ..........................................................................................12

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ..........................................................................................5

*National Soc'y of Prof. Engineers v. United States*,
435 U.S. 679 (1978) ......................................................................................................12

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) ........................................................................................9, 11

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
585 F.2d 821 (7th Cir. 1978) ..........................................................................................7

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) (en banc) ..........................................................................9

*Verizon Comm'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ........................................................................................................6

*Wallach v. Eaton Corp.*,
837 F.3d 356 (3d Cir. 2016) ........................................................................................1, 2

Plaintiffs Walgreen Co. ("Walgreen") and The Kroger Co. ("Kroger") respectfully oppose Defendant Biogen, Inc.'s ("Biogen") motion to dismiss for failure to state a claim. The first half of the motion challenges Plaintiffs' standing by ignoring both the plain allegations of Plaintiffs' Complaint and settled antitrust case law. The second half of the motion essentially repeats arguments that have already been made and responded to in the related case brought by health plans. Biogen's arguments are unavailing and the motion should be denied.

First, while Plaintiffs are indirect purchasers of Tecfidera and Vumerity, they have standing to recover damages because they hold assignments of claims from their direct-purchasing wholesalers—AmerisourceBergen Drug Corporation in Walgreen's case, and Cardinal Health, Inc. in Kroger's case.[1] *See, e.g., In re Opana ER Antitrust Litig.*, 2016 WL 738596, at *5-*6 (N.D. Ill. Feb. 25, 2016) (Walgreen, Kroger and other retailers had antitrust standing pursuant to valid assignments from their wholesalers). Assignments of antitrust claims have been commonplace since shortly after *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), was decided. *See Wallach v. Eaton Corp.*, 837 F.3d 356, 366 (3d Cir. 2016) ("an indirect purchaser may step into the shoes of a direct purchaser and bring an antitrust suit in that capacity if it receives a valid assignment of a direct purchaser's antitrust claims") (citing *In re Fine Paper Antitrust Litig.*, 632 F.2d 1081, 1090 (3d Cir. 1980)). And Plaintiffs allege—repeatedly—that their assignors were overcharged on purchases of Tecfidera and Vumerity because they were required to purchase more units of the branded drugs and fewer units of generic Tecfidera as a result of Biogen's anticompetitive scheme. *E.g.*, ECF No. 1, ¶ 10. Plaintiffs also have standing to obtain injunctive relief because *Illinois Brick* does not apply to claims for such relief.

---

1 Biogen does not dispute that Plaintiffs' assignors are direct purchasers and thus have standing to recover damages under the Clayton Act. *See* Case No. 1:24-cv-07387, ECF No. 60, at 9 & Ex. A (Biogen sells Tecfidera and Vumerity directly to drug wholesalers).

Second, Plaintiffs have adequately alleged that Biogen's conduct violated the Sherman Act. Plaintiffs will briefly respond to Biogen's arguments below and incorporate by reference the relevant portion of the opposition filed in the related case.

## ARGUMENT

### I. PLAINTIFFS HAVE STANDING TO RECOVER DAMAGES PURSUANT TO THEIR ASSIGNMENTS AND TO OBTAIN INJUNCTIVE RELIEF IN THEIR OWN RIGHT.

Biogen has represented to Plaintiffs that it has never sold Tecfidera or Vumerity directly to retailers and Plaintiffs have no basis to dispute that assertion. Accordingly, all parties agree for purposes of this motion that Plaintiffs are indirect purchasers, and their ability to recover overcharge damages therefore rests on the assignments given to them by their direct-purchasing wholesalers. *See Opana*, 2016 WL 738596, at *5-*6 (Retailer plaintiffs had standing based on valid assignments from their wholesalers). Under federal common law, which governs the issue, *see id.*, at *5, an assignment of federal antitrust claims is valid so long as it is in writing and express. *See Wallach*, 837 F.3d at 371; *Opana*, 2016 WL 738596, at *5 ("There is no serious doubt that an antitrust claim can be expressly assigned"). Plaintiffs' assignments are both in writing and express. They were provided to Biogen's counsel (at counsel's request) before Biogen filed its motion and Biogen does not suggest that they are deficient in any way. Accordingly, at least at this stage of the litigation, Plaintiffs have standing under section 4 of the Clayton Act as assignees, and the Court should so hold.[2]

---

[2] Biogen's suggestion that Plaintiffs are somehow seeking to recover overcharges twice on the same purchases (ECF No. 19 at 3)—once pursuant to the assignments, and then a second time because the overcharge was "passed on" to them—is mistaken. As Biogen acknowledges, Plaintiffs are suing only under federal law, *id.*, and of course pass-on damages are not available under federal law. While it is a fact that Plaintiffs, like their assignors, were overcharged for Tecfidera and Vumerity, Plaintiffs seek to recover overcharge damages only as assignees of direct purchasers under federal law, not as indirect purchasers under state law.

Biogen does contend that Plaintiffs have failed to allege that the assigning wholesalers were injured by Biogen's anticompetitive conduct, but this contention is demonstrably false. In fact, Biogen explicitly acknowledges that it is false. As Biogen concedes, Plaintiffs "allege that AmerisourceBergen and Cardinal Health . . . suffered the same supposed injury as the Pharmacies: They were 'overcharged for Tecfidera and Vumerity.'" ECF No. 19 at 3 (quoting ECF No. 1, ¶ 10)). And that allegation, the existence of which Biogen concedes, must be taken as true. *See Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015).

Plaintiffs allege throughout their Complaint that their direct-purchasing wholesalers were overcharged for Tecfidera and Vumerity and explain in detail how that injury occurred. The essential purpose of Biogen's scheme was to suppress generic competition from generic Tecfidera while it switched the market from Tecfidera to Vumerity. *E.g.*, ECF No. 1, ¶ 10 ("Faced with the prospect of an unsuccessful product switch and the impending loss of Tecfidera sales, Biogen resorted to the unlawful, anticompetitive scheme challenged in this action"). As Plaintiffs allege: "Biogen paid the PBMs to give favored treatment to branded Tecfidera and to disadvantage generic Tecfidera on their formularies . . . . As a result, patients paid lower or equal copays for branded Tecfidera than for generic Tecfidera and generic Tecfidera was dispensed at a far lower rate than would have occurred in a normal competitive market. That meant that, while the five conspiring PBMs may have benefited from the scheme, wholesalers and retailers were forced to purchase far more units of branded Tecfidera and Vumerity and far fewer units of generic Tecfidera than they would have purchased in a competitive market—*i.e.*, they were overcharged for Tecfidera and Vumerity." *Id.*

This essential set of facts is repeated throughout the Complaint. *See, e.g.*, ECF No. 1, ¶ 18 ("The difference between the expected substitution of generic Tecfidera and its actual

substitution represents units of the drug that Plaintiffs were required to purchase in the form of branded Tecfidera at monopoly prices rather than in the form of generic Tecfidera at competitive prices"); *id.* ¶ 196 ("Biogen's scheme to suppress generic competition to Tecfidera has substantially and artificially suppressed the sale of generic Tecfidera and has allowed Biogen to charge purchasers monopoly prices for dimethyl fumarate and diroximel fumarate"); *id.* ¶ 198 ("Biogen's scheme and unlawful payments harmed Plaintiffs (and their assignors) by causing them to purchase significantly more units of branded Tecfidera and Vumerity and significantly fewer units of generic Tecfidera as compared to the quantities they would have purchased in a competitive market. The difference between what Plaintiffs' assignors paid to acquire those drugs and what they would have paid to acquire them in a competitive market constitutes overcharges"); *id.* ¶ 213 ("The overcharges paid by Plaintiffs' assignors . . .—*i.e.*, the difference between what they paid for the relevant drugs in the actual world and what they would have paid absent the unlawful scheme and conspiracy—were paid directly to Biogen. . . . As a result of their assignments, Plaintiffs are now the owners and prosecutors of their assignors' direct-purchaser claims").

Thus, Biogen is simply wrong when it claims that neither Plaintiffs nor their assignors were "actually injured" by Biogen's scheme. ECF No. 19 at 8. Plaintiffs allege repeatedly that, as a result of the scheme to suppress generic competition, both they and their assignors paid monopoly prices rather than competitive prices for a substantial number of units of the relevant drugs. Under controlling Supreme Court precedent, that is an overcharge. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968) ("when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4").

Biogen is also mistaken in claiming that Plaintiffs' status as indirect purchasers forecloses their claim for injunctive relief. It is well established that *Illinois Brick* applies only to damages claims and does not affect a plaintiff's right to injunctive relief. *See Apple, Inc. v. Pepper*, 587 U.S. 273, 279 n.1 (2019) ("*Illinois Brick* held that the direct-purchaser requirement applies to claims for damages. *Illinois Brick* did not address injunctive relief"); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 813 (N.D. Ill. 2017) ("Claims for [injunctive] relief . . . by indirect purchasers are not precluded by *Illinois Brick*" and it is "inconsequential" that there may be more immediate victims of the scheme).

Finally, Biogen is mistaken in asserting that Plaintiffs lack Article III standing. ECF No. 19 at 7 n.4. While indirect purchasers are not permitted to recover overcharges under the Clayton Act, they are nevertheless injured by anticompetitive conduct and have Article III standing with or without an assignment. *See Hartig Drug Co. v. Senju Pharm. Co., Ltd.*, 836 F.3d 261, 271-72 (3d Cir. 2016) (indirect purchaser's allegation that it was overcharged for the drugs at issue gave it Article III standing with or without a valid assignment); *Opana*, 2016 WL 738596, at *4 (Retailers alleged that they paid supracompetitive prices for the drugs at issue and therefore had Article III standing).

Now that the health-care plans have dismissed their federal overcharge claims, Biogen is attempting to foreclose recovery by the only other available group of plaintiffs: direct-purchasing wholesalers (and their assignees). But, as the Seventh Circuit has noted, the federal "antitrust laws create a system that, to the extent possible, permits recovery in rough proportion to the actual harm a defendant's unlawful conduct causes in the market without complex damage apportionment. This scheme at times favors plaintiffs (*Hanover Shoe*) and at times defendants (*Illinois Brick*), but it never operates entirely to preclude market recovery for an injury." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 483 (7th Cir. 2002). Aside from its many other

failings, Biogen's position on standing runs headlong into that bedrock principle and should be rejected.

## II. PLAINTIFFS HAVE ALLEGED AN ILLEGAL SCHEME AND CONSPIRACY THAT VIOLATES THE SHERMAN ACT.

The crux of Biogen's argument can be summed up in a single sentence: Biogen did not substantially foreclose competition from generic manufacturers because it did not prevent generic Tecfidera from becoming available. But this contention ignores the way pharmaceutical markets actually operate. As the Supreme Court has emphasized, "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Comm'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). In pharmaceutical markets, the mere existence of one or more competing generic sellers does wholesalers and retailers absolutely no good if they are forced to buy the branded drug at the full monopoly price rather than the generic drug at a competitive price.

In the normal non-pharmaceutical case, entry by competitors into a formerly monopolistic market will reduce the market price by at least a small amount, and if the number of competitors is large the market price can drop substantially. Purchasers of the product or service benefit from the lower market price regardless of which seller they buy from. But in pharmaceutical markets, there is no "market price": there is the brand price (the monopoly price) and the generic price (the competitive price). If the brand company can bring about a situation in which pharmaceutical wholesalers buy the brand 80% of the time and the generic only 20% of the time, rather than the other way around, it will continue to extract monopoly profits from its wholesaler customers no matter how many generics are on the market. And that is exactly what Biogen is alleged to have done here. Biogen was able to maintain its monopoly control of the market despite the existence of AB-rated generic competition.

### A. The Court Should Consider Biogen's Conduct As a Whole.

Biogen contends that "the Court must assess each of the Pharmacies' theories of wrongdoing independently." ECF No. 19 at 10 (citing *In re EpiPen Marketing, Sales Practices and Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022)). But this contention is contrary to both Supreme Court and Seventh Circuit precedent. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"); *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 828 (7th Cir. 1978) (citing *Continental Ore*). In determining the existence of antitrust liability, Biogen's conduct should be viewed "as a whole." *Continental Ore*, 370 U.S. at 699 (internal quotations omitted).

### B. Plaintiffs Adequately Allege That Biogen Interfered With Generic Competition by Bribing PBMs.

Biogen selectively and misleadingly quotes paragraph 65 of Plaintiffs' Complaint as an admission that health plans "may choose which pharmacy networks and drug formularies to use." ECF No. 19 at 10. What Plaintiffs actually allege is the following:

> In short, health plans ***cannot defeat the PBMs' accepting payments from brand manufacturers***. Health plans may choose which pharmacy networks and drug formularies to use among the PBMs' offering based on health plan designs, but information asymmetries hinder their ability to make fully informed decisions. So most health plans accept the standard formularies that the PBMs offer or otherwise defer to their formulary recommendations. Indeed, health plans hire PBMs for their expertise, including in formulary management.

ECF No. 1, ¶ 65 (emphasis added). If health plans had in fact chosen to use formularies that treated generic Tecfidera the way generics are normally treated by PBMs, Biogen's scheme would not have succeeded. But Plaintiffs allege explicitly that Biogen's scheme *did* succeed.

*See, e.g.*, ECF No. 1, ¶¶ 17-18 ("Collectively, Biogen's tactics affected the purchases of well over 75% of all insureds in the country. . . . Biogen's conduct had the intended effect").

More fundamentally, Biogen illogically blames Plaintiffs and their assignors for the alleged inaction of the health-care plans. It cites *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016), for the proposition that "if customers are free to switch to a different product in the marketplace but choose not to, competition has not been thwarted." ECF No. 19 at 10-11. As a matter of antitrust law and policy, Biogen's "customers" are not health care plans; they are drug wholesalers, which bear the entire brunt of the economic harm created by Biogen's Sherman Act violations. *See Illinois Brick*, 431 U.S. at 724-25 ("a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it and . . . the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge"); Case No. 1:24-cv-07387, ECF No. 60 at 9 & Ex. A (Biogen's customers are wholesalers). As the health care plans explain in their brief, the plans have no commercially viable way to monitor or alter the treatment of Tecfidera and its generic equivalents by the bribed PBMs. And wholesalers like AmerisourceBergen and Cardinal Health plainly have no ability at all to choose formularies or control individual drug placement, either in theory or in practice. They buy the drugs that their retailer customers order. The wholesalers were not "free to switch to" generic Tecfidera when their customers ordered branded Tecfidera and Vumerity.

Biogen repeats this mistake. It asserts that Plaintiffs "never allege that *they* sold Tecfidera or Vumerity—or even operated pharmacies—in States where generic substitution was supposedly foreclosed." ECF No. 19 at 11 (emphasis in original). But the overcharge claims being asserted by Plaintiffs in this case are the claims of AmerisourceBergen and Cardinal Health, which do not operate pharmacies at all. And in any case overcharge claims are based on

*purchases*, not sales. Plaintiffs *do* allege that, as a result of Biogen's scheme, the two assigning wholesalers were required to purchase more units of branded Tecfidera and Vumerity and fewer units of generic Tecfidera than they would have purchased in a competitive market—*i.e.*, they were overcharged. That is all that is required to state a claim.

It is true, of course, that generic-substitution laws "do not prohibit branded pharmaceutical manufacturers from competing against generic entrants." ECF No. 19 at 12. Branded companies typically compete with generic entrants by launching an "authorized generic" or "AG" to capture some portion of the sales that otherwise would go to the ANDA filer. AGs lower the generic price and benefit purchasers. *See Opana*, 2016 WL 738596, at *2 (brand company paid generic competitor in part by agreeing not to launch an AG). But bribing PBMs to promote the brand product so the brand manufacturer can continue to extract monopoly profits from wholesalers is not competition on the merits; it is interference with automatic substitution—the sole means by which generic competitors can efficiently compete. As the Court recognized in its prior opinion, *see* Case No. 1:24-cv-07387, ECF No. 98 at 13, and as the Second Circuit explained in the *Namenda* case, "competition through state drug substitution laws is the *only* cost-efficient means of competing available to generic manufacturers." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 655-656 (2d Cir. 2015) ("*Namenda*") (emphasis added). "For there to be an antitrust violation, generics need not be barred 'from all means of distribution' if they are 'barred . . . from the cost-efficient ones.'" *Id.* at 656 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001) (en banc)). *See also In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 274, 330 (D.R.I. 2019) ("That Loestrin generics eventually entered the market does not preclude a finding of anticompetitive conduct—the jury could still find that Warner Chilcott . . . engaged in anticompetitive conduct by obstructing automatic generic substitution, a cost-efficient means of increasing competition").

Biogen also asserts that it cannot be held liable for bribing the PBMs to subject generic Tecfidera to "the same" dispensing restrictions that the PBMs were already imposing on branded Tecfidera. ECF No. 19 at 13-14. But, as the health-care plans point out, imposing "the same" restrictions on two identical products, one of which costs many times as much as the other, is not equal treatment as a matter of economics. Like disadvantageous formula placement, the dispensing restrictions on generic Tecfidera that Biogen bought and paid for suppressed generic competition by depriving Biogen's generic competitors of the benefits of automatic substitution —their only cost-efficient means of competing. This is more than sufficient to support Plaintiffs' claim for relief here.

Biogen also misunderstands the relevance of Plaintiffs' allegations that Biogen took steps to ensure that generic Tecfidera was designated as a specialty drug, thereby limiting its retail distribution to specialty pharmacies. ECF No. 19 at 13. Plaintiffs allege that limiting retail distribution of the drug to specialty pharmacies would result in high prices to patients and health-care plans, not to wholesalers or non-specialty pharmacies. However, like the other elements of Biogen's scheme, this aspect suppressed the substitution rate of generic Tecfidera and contributed to the overcharges paid by Plaintiffs' assignors. ECF No. 1, ¶¶ 139-144, 146-147. Even if a jury were ultimately to find that this particular component of the scheme did not independently result in overcharges to Plaintiffs' assignors, there is no requirement that each individual element of an anticompetitive scheme result in injury to the plaintiff, so long as the scheme as a whole does so. *See, e.g., In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 355-56 (D.N.J. 2009) (plaintiff "need not allege proximate cause or antitrust injury separately for each component of the alleged scheme. The injuries inflicted by [the defendant's] allegedly anticompetitive activities should, instead, be viewed as a whole").

Plaintiffs have adequately alleged that Biogen foreclosed generic competition by paying PBMs to disadvantage generic Tecfidera on their formularies, resulting in injury to Plaintiffs' assignors. *See In re Copaxone Antitrust Litig.*, 2025 WL 961538, at *10-*15 (D.N.J. Feb. 27, 2025) (Report and Recommendation by Special Master: drug wholesalers had adequately alleged that agreements between Teva Pharmaceuticals and PBMs to disadvantage generic Copaxone violated the Sherman Act).

### C. Plaintiffs Adequately Allege That the Copay Assistance Program Interfered With Automatic Generic Substitution.

Biogen also challenges Plaintiffs' allegations that Biogen provided copay assistance coupons to ensure that patients stayed on branded Tecfidera rather than switching to generic Tecfidera. ECF No. 19 at 14-15. Biogen cites the *Copaxone* Report and Recommendation for the proposition that forcing pharmaceutical wholesalers to purchase more units of the branded drug and fewer units of the generic drug may constitute harm to those wholesalers but does not amount to "harm to the market as a whole." *Id.* at 14.

Biogen is mistaken. As explained in Plaintiffs' Complaint, pharmaceutical markets have imperfections that allow branded companies to obtain and exercise monopoly power up until the moment they face AB-rated generic competition. *See* ECF No. 1, ¶¶ 28-31, 45. That monopoly power is dissipated *only* by AB-rated generic competition—and not because doctors start writing prescriptions for the generic, but because retail pharmacies are required or at least permitted to substitute an AB-rated generic at the pharmacy counter. *See Namenda*, 787 F.3d at 655-56. Any conduct that interferes with automatic generic substitution allows branded manufacturers to continue to sell large quantities of the branded drug at monopoly prices notwithstanding the existence of one or more generic competitors. *See* Case No. 1:24-cv-07387, ECF No. 98 at 13 (citing *Namenda*). Purchasers continue to pay monopoly prices and the brand

manufacturer continues to earn monopoly profits. This is exactly the same anticompetitive harm that the Supreme Court found sufficient to support antitrust liability in the *Actavis* case. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 154 (2013) ("The patentee and the challenger gain; the consumer loses"). If that harm does not constitute harm to "the market as a whole," it is difficult to imagine what would. *See id.* at 148 (agreements that delay normal generic competition "tend to have significant adverse effects on competition"); *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 403-04 (3d Cir. 2015) ("reverse payments are problematic because of their potential to negatively impact consumer welfare").

It is true, of course, that copay coupons reduce or eliminate the copay for individual consumers. But they are not price discounts to the brand company's actual customers—wholesalers—and the modest savings they do create are dwarfed by the economic harm imposed on every other participant in the distribution chain: wholesalers, retailers and health plans. That is the whole point of providing them. As Plaintiffs allege, "Biogen . . . delayed and impaired competition from generic Tecfidera by undermining the incentives that some formularies put in place to encourage insureds to buy the generics. Thus, even when Biogen had not succeeded in paying to rig a formulary against generic Tecfidera, Biogen still anticompetitively undermined insureds' incentives to choose the dramatically lower-cost generics." ECF No. 1, ¶ 159. Biogen's use of copay assistance coupons disabled the price signals on which price competition depends. *See National Soc'y of Prof. Engineers v. United States*, 435 U.S. 679, 692-93 (1978) (undermining buyers' "ability to utilize and compare prices . . . [o]n its face . . . restrains trade within the meaning of § 1 of the Sherman Act") (internal quotations omitted).

Both courts and economists have recognized that copay assistance schemes can be anticompetitive by interfering with automatic generic substitution. *See Loestrin*, 433 F. Supp. 3d

at 331 (brand company's anticompetitive tactics included "implementing a patient savings program"); ECF No. 1, ¶¶ 168-170. Plaintiffs have alleged that Biogen's copay assistance program, in conjunction with its other conduct, allowed Biogen to maintain monopoly power in the face of AB-rated generic competition. *E.g.*, *id.*, ¶ 196. That is sufficient to state a claim under the Sherman Act.

### D. Plaintiffs Adequately Allege That Biogen Restricted the Supply of Generic Tecfidera By Terminating a Contract With Teva to Sell an AG.

Finally, Biogen challenges Plaintiffs' allegations that it directly reduced the supply of generic Tecfidera by terminating a contract with Teva under which Biogen supplied Teva with, and Teva resold, a Tecfidera authorized generic. ECF No. 19 at 15. Biogen characterizes these allegations as "unproven" and says that Plaintiffs have not alleged that termination of the Teva contract "impacted the price or availability of generic Tecfidera." *Id.* It is true of course that the allegations remain "unproven," but Plaintiffs are not required to prove the allegations in their Complaint at the pleading stage. And taking a generic off the market *necessarily* affects the "price or availability" of generic Tecfidera. Moreover, Plaintiffs have alleged that "Biogen decided to eliminate the AG Tecfidera because of the threat it posed to Vumerity." ECF No. 1, ¶ 192. That alone is sufficient to include termination of the contract as an element of Biogen's scheme. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (monopolist's intent helps to determine "whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive'"). As noted above, the Court should assess Biogen's conduct as a whole, both with respect to its impact on the market and with respect to its impact on Plaintiffs or their assignors. *See Continental Ore*, 370 U.S. at 699; *Gabapentin*, 649 F. Supp. 2d at 655-56.

## CONCLUSION

In order to avoid burdening the Court with additional briefing, Plaintiffs respectfully incorporate pages 4 through 19 of Plaintiffs' Opposition to Defendant Biogen Inc.'s Motion to Dismiss Plaintiffs' Second Amended Complaint, Case No. 1:24-cv-07387, ECF No. 129 (filed Nov. 25, 2025). For the reasons stated above and in the incorporated Opposition, Biogen's motion should be denied.

Respectfully submitted,

/s/ Trevor K. Scheetz

Trevor K. Scheetz
SPERLING KENNY NACHWALTER LLC
321 N. Clark Street, 25th Floor
Chicago, IL 60654
Telephone: (312) 641-3200
Email: tsheetz@sperlingkenny.com

Scott E. Perwin (*pro hac vice*)
Lauren C. Ravkind (*pro hac vice*)
Anna T. Neill (*pro hac vice*)
SPERLING KENNY NACHWALTER LLC
Four Seasons Tower, Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone: (305) 373-1000
Email: sep@sperlingkenny.com
Email: lcr@sperlingkenny.com
Email: atn@sperlingkenny.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 2, 2026, a true and accurate copy of the foregoing was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois through the CM/ECF system, which resulted in service of the foregoing on all counsel of record.

/s/ Scott E. Perwin
Scott E. Perwin (*pro hac vice*)